**Anna M. SOUSA, Plaintiff,**

v.

**Shirley S. CHATER, Commissioner of Social Security, Defendant.**

**No. CIV–S–95–0760–GGH.[1]**

United States District Court,
E.D. California.

Sept. 30, 1996.

---

**1.** This case is before the undersigned pursuant to the consent of the parties to proceed before a magistrate judge. 28 U.S.C. § 636(c).

James L. Bianchi, Law Offices of James L. Bianchi, Benicia, CA, for Anna Sousa.

Mary L. Grad, United States Attorney, Sacramento, CA, for Commissioner of Social Security.

## ORDER

HOLLOWS, United States Magistrate Judge.

Plaintiff Anna Sousa seeks judicial review of a final decision of the Commissioner of Social Security (hereinafter "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). This matter is before the undersigned pursuant to the consent of the parties (28 U.S.C. § 636(c)), and was submitted for decision without oral argument on April 27, 1995. The undersigned subsequently directed the parties to submit supplemental briefing regarding the effective date of recently enacted Public Law 104–121 §§ 105(a)(1), and 105(b)(1), which preclude the award of benefits to Social Security Disability and Supplemental Security Income applicants whose substance abuse problem is a contributing factor material to the determination of an applicant's claimed disability. As explained below, it is the conclusion of this court that this new law applies to plaintiff's claim and requires a denial thereof, due to the clear weight of the evidence that plaintiff's substance abuse was a significant contributing factor to her claimed disability of mental impairment. The court therefore denies plaintiff's motion for summary judgment.

## PROCEDURAL BACKGROUND

Plaintiff originally filed applications for DIB and Supplemental Security Income ("SSI") on May 27, 1988. (TR. 67) The Social Security Administration denied plaintiff's applications initially on October 31, 1988 (TR. 67), and upon reconsideration on April

21, 1989 (TR. 78), on the ground that the claimant was not disabled as defined by sections 223(d) and 1614(a)(3)(A) of the Social Security Act. Plaintiff failed to appeal, making the April 21, 1989, determination final.

Plaintiff was subsequently awarded SSI commencing in February of 1993, due to mental illness and substance addiction. (TR. 106, 107).[2]

Claimant filed a subsequent application for DIB on July 28, 1992, alleging disability since February 11, 1987, due to mental illness and depression. (TR. 117–24). The application was supported by evidence in addition to that considered in the original application. The Social Security Administration denied benefits initially on February 16, 1993, and upon reconsideration on May 19, 1993. (TR. 96, 111). A hearing was held on March 24, 1994, before Administrative Law Judge ("ALJ") Michael D. Tucevich. The ALJ, in an April 6, 1994 decision, held that the claimant was not entitled to benefits. The ALJ found that the April 21, 1989 determination, that claimant was not disabled prior to the expiration of her insured status, was the final determination of the Commissioner and bound plaintiff pursuant to the doctrines of administrative finality and *res judicata*. The ALJ declined to reopen or revise the April 21, 1989, determination under 20 C.F.R. 404.987 et. seq., since the claimant failed to establish good cause.

■ On October 3, 1994, the Appeals Council granted claimant's request for review of the ALJ determination and reopened the matter.[3] The Appeals Council found good cause, pursuant to Social Security Ruling 91–5p, to extend the time period in which to request review of the April 21, 1989 reconsideration determination. Good cause was furnished by the claimant's mental impairment which may have hampered her ability to properly appeal the reconsideration determination. (TR. 395–397). Upon review, however, the Appeals Council concluded that the claimant was not entitled to DIB (TR. 5–21), specifically finding (TR. 11):

1. The claimant met the special earnings requirements of the Act on June 15, 1986, the date the claimant stated she became unable to work and met them through December 31, 1987, the date she last met the disability insured status requirement of the Act. The claimant has not engaged in substantially gainful activity since the date of the alleged onset of disability.

2. On or before December 31, 1987, the claimant had the following medically determinable impairments: dysthymia and substance abuse.

3. The symptoms reported by the claimant and her husband for the period on or before December 31, 1987, were not credible.

4. For the period on or before December 31, 1987, the claimant did not have any impairment or combination of impairments which had more than a minimal effect on her ability to do any work activity.[4] Therefore, the claimant did not have a severe impairment (20 CFR 404.1520(c)).

5. The claimant was not disabled as defined by the Social Security Act and any time through December 31, 1987.

On April 27, 1995, plaintiff filed a complaint in federal court seeking review of the Appeals Council's determination. On October 16, 1995, plaintiff filed a motion for sum-

---

2. No direct documentation of the SSI award is present in the record, although all parties agree that the plaintiff obtained such benefits commencing in February 1993.

3. When the Appeals Council accepts review and renders a decision, the final decision of the Commissioner is that of the Appeals Council. 20 C.F.R. § 404.981; *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir.1988).

4. Plaintiff is afflicted with an arthritic condition of the hands (TR. 60), but does not contend that this condition entitles her to DIB. (TR. 56, 60). To foreclose any potential award of DIB for her arthritic condition, however, the Appeals Council found that no evidence existed to show that the claimant's arthritic condition existed before December 31, 1987, or, if it did, that there were any exacerbations of the condition between June 15, 1986 and December 31, 1987.

mary judgment. James L. Bianchi, who represented the plaintiff during the administrative proceedings, continues to represent her before this court. The Commissioner filed a cross-motion for summary judgment and in opposition to plaintiff's motion for summary judgment.

## ISSUES PRESENTED

Although plaintiff focuses her challenge on the Appeals Council's finding that plaintiff's mental impairment during the time in question (February 11, 1987 through December 31, 1987) was not a "severe impairment" within the meaning of the Act,[5] the dispositive issue herein is framed by the recent amendment to Social Security/Supplemental Security Income law that precludes an award of benefits under either program if a claimant's substance abuse problem would "be a contributing factor material to the Commissioner's determination that the individual is disabled." P.L. 104–121 §§ 105(a)(1), 105(b)(1).[6] Therefore, two issues present themselves for resolution:

(1) whether plaintiff's substance abuse was a contributing factor material to her alleged mental impairment;

(2) whether the recent amendments are to be applied retrospectively to plaintiff's case.

Because resolution of the first question necessarily requires careful analysis of the record, the court initially sets forth the pertinent underlying facts.

## FACTUAL SUMMARY

### 1. Plaintiff's Claims

Plaintiff was born on November 27, 1955, and was 38 at the time of the hearing. (TR. 67, 40). Plaintiff has a 12th grade education. (TR. 201). Her limited past work experience includes waiting tables and taking inventory in a drug store. (TR. 133). Most recently, plaintiff worked as a waitress from March 1985 to June 15, 1986, when she was discharged for stealing food. (TR. 133, 45). At the time of her discharge she was allegedly experiencing difficulties in performing her duties. This included confusing or forgetting food and drink orders due to an inability to concentrate. (TR. 45, 51). Plaintiff's husband believed at the time that she would have soon been fired because of these difficulties. (TR. 51).

Plaintiff has a history of substance abuse, and during her most recent employment was using drugs and alcohol. (TR. 175, 42). This abuse worsened after her discharge. (TR. 42, 45–46). In addition, plaintiff was undergoing a difficult divorce and child custody dispute since 1984 which culminated in her first husband taking their 5–year–old son in February of 1987. (TR. 42). Due to these factors, by February 11, 1987, plaintiff alleges the onset of dysthymia, a disabling mood disorder, which has made it impossible for her to perform gainful activity.

Plaintiff testified as to her unusual behavior during 1987 as evidence of the existence of her disorder before the expiration of her insured status. This activity included an inability and unwillingness to care for herself. Plaintiff would spend all day in bed, refuse to dress or bathe, and was unable to cook for herself. (TR. 40, 41). The plaintiff also testified that she had difficulties concentrating; she would leave the tap water running or burn food on the stove if she attempted to cook. (TR. 41, 47). In addition, plaintiff acted irrationally, cleaning her apartment with white spray paint and refusing to leave the house out of fear. (TR. 41, 60).

---

5. Plaintiff also contends that substantial evidence does not support the Appeals Council's finding that the testimony of plaintiff and her husband was not credible; and that plaintiff's depression met the requirements for a listed impairment under 20 CFR Pt. 404, Subpt. P, App. 1, Para 12.04.

6. Sec. 105. Denial of Disability Benefits To Drug Addicts and Alcoholics.

(a) Amendments Relating to Title II Disability Benefits

(1) IN GENERAL.—Section 223(d)(2) of the Social Security Act (42 U.S.C. 423(d)(2)) is amended by adding at the end the following: "(C) An individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.".

Plaintiff's husband confirmed her erratic behavior during 1987. He testified that plaintiff would plug electrical outlets with paper to keep out electricity, cover the windows with blankets out of paranoia, and boil her clothes to prevent infestation by bugs. (TR. 40, 49, 51). In addition, he testified that plaintiff suffered from insomnia, often going for days without sleeping due to a fear of falling asleep. (TR. 52).

In February of 1988, plaintiff's family placed her in a state psychiatric hospital in Napa for a 72-hour hold as a result of her behavioral problems. (TR. 200). In July 1988, plaintiff grew concerned about her substance abuse problem and voluntarily entered a detoxification program at the Gateway Rehabilitation Clinic. Upon release on August 23, 1988, she allegedly refrained from further use of drugs or alcohol. (TR. 46). In the months that followed, however, her irrational behavior continued. (TR. 46, 47). Plaintiff tried to attend Alcoholics Anonymous and Narcotics Anonymous meetings, but did so rarely because she was afraid. (TR. 157). Plaintiff had continued feelings of paranoia, and believed that others were watching her or intending to harm her. (TR. 156). Also, plaintiff's activities were limited, and she required a great deal of encouragement to go outdoors and relied on others for transportation. (TR. 153). Plaintiff's social contacts were limited to her boyfriend and certain family members, and she claimed to have difficulty interacting even with them. Also, plaintiff had difficulty concentrating and would easily get confused. (TR. 166). She was still unable to clean, cook for herself or shop for food, although she attempted minor chores about the house. (TR. 154, 155). Plaintiff still slept no more than three or four hours per night. (TR. 157).

Despite her efforts and claims of drug abstention, the record shows that plaintiff was using alcohol and crank in October and November of 1989. (TR. 339, 340). She also used amphetamines and/or methamphetamines in June and December of 1991, which resulted in at least one psychotic episode wherein she covered the interior of her apartment with white paint. (TR. 285, 110). Plaintiff continued to be plagued by her mental disorder and substance abuse problem throughout 1991, and was hospitalized on numerous occasions. (TR. 263–295). In February 1993, plaintiff was diagnosed with dysthymia, psychomotor retardation, organic mental disorder, and substance addiction disorder. (TR. 84–92). Plaintiff continues to be unable to care for herself and experiences difficulty communicating with others, concentrating on simple tasks, and comprehending simple matters. (TR. 139). As of February 1993, plaintiff's organic mental disorder qualified her to receive benefits for SSI.

### 2. *The Medical Review*

The majority of medical records contained in the administrative file are dated 1988 and later. The following summarizes plaintiff's medical records starting with her group counseling in 1984 as well as an examination by Dr. Goldberg, the only objective medical examination available from 1987. Records from plaintiff's extensive hospitalization and counseling in 1988, follow-up in 1989, her 1991 hospitalization and the finding of disability for SSI purposes in 1993 are also included. A 1994 report by Dr. Lundeen interpreting the Goldberg examination on plaintiff's behalf is summarized as well. While the latter records are not directly indicative of plaintiff's condition in 1987, they are nonetheless probative of her condition at that time, insofar as they reflect upon long-standing conditions.

*Solano County Mental Health, (12/28/84 to 8/19/85), (TR. 357–370)*

Plaintiff entered a group therapy program through Solano County Mental Health in December of 1984, seeking treatment for depression due to an impending divorce and custody battle. (TR. 357). Plaintiff was subject to a mental status examination in January 1985. The evaluator utilized the Multiaxial System set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, DSM–III–R (Axis I referring to Clinical Syndrome, Axis II to Developmental Disorders, Axis III to Physical Disorders and Conditions, Axis IV to Severity of Psychosocial Stressors, and Axis V to Global Assessment of Functioning

(or GAF score)). Plaintiff's results included (TR. 367):

 Axis I: Adjustment disorder with depression (309.00); continuous alcohol abuse (305.91); no observable mental disorder.

 Axis II & III: Deferred

 Axis IV: Mild severity of psychosocial stressors

 Axis V: GAF of 50 [7]

The examiner noted plaintiff's dysphoric mood, blunted affect, limited insight and pressured speech. (TR. 367). Plaintiff stated she had difficulty sleeping. (TR. 368).

Scheduled weekly counseling meetings, which plaintiff sporadically attended, addressed her depression and alcohol abuse. Plaintiff expressed feelings of being overwhelmed when coping with the impending divorce and child custody battle, and generally failed to take care of herself during this period. (TR. 360). The therapist noted that plaintiff's bizarre and disregarding behavior was sustained through continued use of alcohol (TR. 360), which plaintiff's mother reported was up to a six-pack of beer a day. (TR. 359). Plaintiff reportedly failed to follow through on treatment for her alcohol abuse. (TR. 358–360).

Counseling also addressed plaintiff's family history, which included mental and physical abuse. (TR. 361). Her parents had divorced after a 15-year abusive marriage. (TR. 363, 366). Her father was an alcoholic and would often beat plaintiff and her siblings. (TR. 363). Plaintiff also reported that her mother mentally abused her. Plaintiff married at age 19 to a drug addict who left her for another woman and sought divorce after 6 years of marriage. (TR. 362, 366). By the time plaintiff dropped out of counseling in August 1985, she had made little progress toward her stated therapy goals. (TR. 357).

*Mark Goldberg, MD., (3/31/87), (TR. 380)*

Dr. Goldberg saw plaintiff one time on March 31, 1987, and diagnosed her as suffering from anxiety and depression. He noted that she had been undergoing a stressful divorce and the husband had taken her son from her. In addition, her divorce attorneys had allegedly defrauded her and were undergoing investigation.

The plaintiff reported having physical symptoms including extreme tension with pain in her head and neck, accompanied by a gritting of the teeth and clenching of fists. In addition, she reported having insomnia, some appetite loss, some decreased energy level, and feelings of hopelessness and helplessness. Plaintiff stated that she often cried.

Dr. Goldberg recommended that she restart counseling for anxiety and depression and provided a one week prescription of Xanax. He instructed her to follow up in one week, at which time he intended to place her on the pure antidepressant, Elavil. There is no evidence that plaintiff ever received additional treatment from Dr. Goldberg.

*Napa State Hospital/Solano County Mental Health, (2/3/88 to 2/11/88), (TR. 186–197; 198–231; 305–313)*

Detailed medical examination and examination of plaintiff's impairments began in February of 1988, prompted by her bizarre and destructive behavior. On February 3, 1988, plaintiff's mother contacted the police stating plaintiff had destroyed the interior of a hotel room for no apparent reason. Plaintiff's mother stated that plaintiff was talking with drug dealers she believed were behind a mirror, was acting paranoid and was verbally abusive. Plaintiff's mother described plaintiff as barefoot, having toothpaste smeared on her face, having a broken zipper on her jeans, having wet and uncombed hair and having poor personal hygiene. (TR. 313). A police report of the incident noted plaintiff was likely on drugs, was yelling incoherently, and had appeared disoriented and confused. (TR. 186). Plaintiff's mother reported similar behavior had occurred over the last two years, where plaintiff would flood or otherwise destroy her apartment, and attributed such behavior to alcohol and drug abuse. (TR. 192). This particular episode prompted

---

**7.** A Global Assessment of Functioning Scale describes scores between 41 and 50 as having "serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders, p. 12 (3rd. ed. 1987).

plaintiff's mother to take her to a crisis center.

Solano County Mental Health Crisis Center performed a mental status examination on plaintiff on February 3, 1988. (TR. 312). Plaintiff was diagnosed as follows:

Axis I: Adjustment disorder with mixed emotional features (309.28)

Axis II & III: Deferred

Axis IV: Severe psychosocial stressors

Axis V: GAF rating of 40; [8] poor adaptive functioning over past year

The evaluator noted that plaintiff's mood was depressed and anxious, while her affect was labile. Her speech was pressured and she expressed feelings of hopelessness, helplessness and low self-worth. Plaintiff showed minimal judgment. Plaintiff's recent and past substance abuse included alcohol, marijuana and amphetamines. (TR. 311, 312). Plaintiff stated, however, that the source of her problems was not substance abuse, but that she missed her son whom her ex-husband had taken away. (TR. 311). Subsequent to the examination, plaintiff ran away from the Crisis Center and the police were required to locate her. (TR. 200).

Plaintiff's mother then admitted her to Napa State Hospital for a 72–hour hold on February 9, 1988, on a Solano County 5150 detention. The chief complaints upon admission were that plaintiff had trouble concentrating and making plans, had flight of ideas, pressured speech and loose associations. (TR. 199, 200). In addition, plaintiff was totally disorganized in terms of making reasonable living plans, slept excessively and would not eat. (TR. 200). Plaintiff stated that she was gravely disabled. (TR. 197). Evaluators suspected drug and alcohol abuse, although plaintiff denied such use. (TR. 309).

A second mental status examination upon plaintiff's admission diagnosed her as follows (TR. 310):

Axis I: Adjustment disorder with mixed disturbance of emotions and conduct, alcohol abuse, and drug addiction.

Axis II & III: Deferred

Axis IV: Moderate severity of psychosocial stressors

Axis V: GAF 45; poor adaptive functioning over past year

In addition, plaintiff's mood was anxious, her affect was inappropriate and she exhibited pressured speech and expressed feelings of helplessness. The examination also found plaintiff to be disoriented with impaired memory, overly concrete abstraction, moderate judgment, no insight and minimal concentration. Although plaintiff denied any current drug use, she reported recent and past substance abuse to include a six pack of beer a day, pot, crank, and cocaine. (TR. 225, 310). The admission evaluation also notes that plaintiff's mother, father and brother had substance abuse problems. (TR. 201).

During her stay at Napa, plaintiff was diagnosed with a dysthymic disorder, characterized by depression and anxiety. (TR. 222, 209). The examination noted that plaintiff had average psychomotor activity and was generally oriented to time and place. (TR. 202). Plaintiff's speech was clear, coherent, and goal directed, but vague at times with slight pressure. (TR. 209). Her affect was blunted and she expressed a fear of being at the hospital. (TR. 209). Plaintiff was given Ativan for her anxiety and thereafter was calm and cooperative, with no behavioral problems during her stay. (TR. 202, 204). She showed no evidence of psychotic or suicidal thinking or violent behavior (TR. 202, 203), and spent significant periods of time in bed. (TR. 205). Plaintiff also showed signs of recent weight loss. (TR. 228). The hospital discharged plaintiff after 72 hours for follow up treatment on grounds that she did not fit the criteria for dangerous or grave disability. Plaintiff was prescribed Ativan for her anxiety, with follow up treatment

---

**8.** A Global Assessment of Functioning Scale describes scores between 31 and 40 as "having some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work)." Diagnostic and Statistical Manual of Mental Disorders (3rd ed. 1987).

through Solano County Mental Health. (TR. 203).

Hospital staff initially suspected plaintiff's behavioral problems were attributable to substance abuse. Although plaintiff claimed she presently abstained from drug use, test results available after her discharge indicated amphetamine, opiates and benzodiazepines in her system. (TR. 214). These results comport with statements by plaintiff's mother, sister and family physician that plaintiff's use of alcohol, cocaine and crank were "primary contributors" to her "bizarre behavior over the past two years". (TR. 192).

A final psychiatric evaluation conducted upon discharge on February 11, 1988, confirmed prior diagnosis (TR. 195):

Axis I: Dysthymia (300.40) and unspecified substance abuse (305.90).

Axis II: Deferred

Axis III: Arthritis

Axis IV: Moderate severity of psychosocial stressors

Axis V: Poor adaptive functioning over the past year

*Gateway Rehabilitation Center, (7/20/88 to 8/23/88), (TR. 232–254)*

Plaintiff, with the assistance of her family, sought admission to the detoxification and substance abuse rehabilitation program at Gateway on July 20, 1988. Upon admission, plaintiff was acutely toxic, having used Tylenol with Codeine, crystal methadrine, Xanax and alcohol earlier that day. Within previous weeks she had also used Valium, Cocaine, Triavil, Ativan, Motrin and Vasten. Upon examination, plaintiff was diagnosed with heroin, "speed," Codeine, Valium and alcohol dependence. Admitting personnel noted plaintiff was atremulous, detached, reasonably coherent, nervous and somewhat frightened upon arrival. (TR. 233).

Clinical staff noted that her long history of substance abuse was, in part, the product of a severely dysfunctional family and her interpersonal environment. (TR. 234). Starting at age 15 she began drinking alcohol and by age 19 took speed on a daily basis. Throughout her twenties she used alcohol, diet pills, out her twenties she used alcohol, diet pills, speed, and crank. By 30 she regularly used Codeine, Motrin, Valium, and Demerol in addition to alcohol and speed. On occasion, she used Cocaine, acid, hash, Librium, Tuinol, Seconol and percs. (TR. 245).

Plaintiff reportedly progressed well throughout her course of treatment, participating in group therapy and acknowledging the severity of her addictions. During the last four days of treatment, however, plaintiff reversed all progress she had made. She became very disorganized and anxious, and canceled her prepared aftercare plans. Upon discharge, plaintiff stated her intention to attend Alcoholics Anonymous and Narcotics Anonymous meetings. Her doctor's prognosis for ongoing recovery, however, was guarded. (TR. 234).

*Kaiser Patient Progress Reports, (10/89, 12/89, 10/90), (TR. 340, 337)*

Kaiser Hospital maintained patient progress reports of plaintiff's condition. Entries from October and December 1989 note that plaintiff had resumed use of crank and alcohol. Also, plaintiff wouldn't sleep for 3 to 5 days at a time and would often not eat. (TR. 340). In an entry dated November 6, 1990, plaintiff once again claimed to have stopped taking street drugs. (TR. 337).

*Alta Bates–Herrick Hospital, (4/91 to 12/91), (TR. 263–295)*

Plaintiff was first hospitalized at Alta Bates from April 12 through April 22, 1991. She was diagnosed with a bi-polar affective disorder, having shown the onset of an acute emotional withdrawal with severe depressive symptoms and uncontrollable crying. She had been receiving treatment for depression with lithium carbonate for the past year and a half and Prozac for the past four months. Prior to admission, her husband noted that her depression had worsened and she was withdrawn, lethargic, and had difficulty communicating. Plaintiff was resistant to treatment and when questioned would tighten her muscles, forcefully shut her eyes, and refuse to verbally interact. There were also symptoms of a possible seizure disorder and episodes of incontinence. Plaintiff's physician attributed her worsening mental state to hypothyroidism. She was treated with thyroid

medication, to which she responded well, and discharged after nine days. (TR. 263, 264, 276). A drug screen tested negative. (TR. 272).

Plaintiff returned to Alta Bates–Herrick Hospital on June 4, 1991, on a 5150 initiated by the police who found her disoriented in her apartment, having covered most of its contents with white paint. Plaintiff reported hearing voices and was unable to recall how she arrived at the hospital. She showed evidence of a slowing mentation and a severe impairment of judgment. A drug screen tested positive for methamphetamines and amphetamines. Her physician attributed her destructive behavior to a probable toxic response to the amphetamine use. (TR. 276, 277). Plaintiff's discharge diagnosis noted an atypical psychosis. (TR. 276, 277).

Plaintiff's last hospitalization with Alta Bates was from December 14 through December 17, 1991, when she insisted that, as the holidays approached, she would discompensate into a psychotic state. A drug screen tested positive for amphetamines. (TR. 287–289). Plaintiff was then transferred to Kaiser–Martinez.

*Kaiser–Martinez (12/17/91 to 12/23/91), (TR. 296–304)*

A mental status examination of plaintiff upon admission to Kaiser noted that plaintiff's thought processes were "confusing" and she could not coherently impart information. Her mood was depressed and her affect somewhat flattened, and she reported having hallucinations. Also, her insight and judgment were impaired, although she was oriented and there was no evidence of an organized paranoid delusional system. Plaintiff was diagnosed on the 5-axis scale as follows:

Axis I: Polysubstance dependence; organic mental disorder ruled out.

Axis II: Personality disorder, not otherwise specified.

Axis III: "Seizure disorder." (by history).

Axis IV: Moderate psycho stressors.

Axis V: Admission GAF of 55; Past Year GAF of 70; Discharge GAF of 65.[9]

Plaintiff eventually acknowledged her drug use, and the evaluator noted that her decompensations requiring hospitalization and even her reported seizure disorder were probably due to chemical dependency problems.

*Freddie Weinstein, MD., Mental Status Examination, (1/17/93), (TR. 344–346)*

Dr. Weinstein performed a mental status examination of plaintiff on January 17, 1993. He observed profound psychomotor retardation in plaintiff, as she would just sit and stare. Although her mood was "OK", her affect was blunted and her speech monotone. Her thought processes were goal directed and she denied any current suicidal or homicidal ideation, hallucinations, or paranoid or somatic delusions. Although alert, plaintiff was oriented only to her name, the present year and the city where she was. Plaintiff's ability to maintain concentration and attention, understand simple matters, remember things, follow simple instructions and interact with others was limited. Dr. Weinstein diagnosed plaintiff as follows:

Axis I: Polysubstance abuse; organic mental disorder (not otherwise specified); psychosis (not otherwise specified)

Axis II & III: Deferred

Axis IV: Moderate psychosocial stressors

Axis V: Poor current level of functioning

9. A Global Assessment of Functioning Scale describes scores between 51 and 60 as having "moderate symptoms (e.g., flat effect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with co-workers)." Scores between 61 and 70 are described as having "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning, but generally functioning pretty well" with "some meaningful interpersonal relationships." Scores between 71 and 80 are described as: "If symptoms are present, they are transient and expectable reaction to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning." The court finds these relatively "high" GAF scores inconsistent with the record as a whole, and with the finding of organic mental disorder in 1993, and therefore discounts their probative value.

*State Agency Determination, (2/8/93, 3/16/93), (TR. 83–95)*

In February 1993, plaintiff was diagnosed with dysthymia, psychomotor retardation, organic mental disorder, and substance addiction disorder. (TR. 84–92). Her evaluator noted her disorientation to time and place and her memory impairment. (TR. 86). In addition, plaintiff displayed oddities of thought, perception, speech and behavior, as well as persistent disturbances of mood or affect. The evaluation noted that plaintiff maintained intense and unstable interpersonal relationships and exhibited impulsive and damaging behavior. (TR. 89). Plaintiff had marked restrictions of activities of daily living, moderate difficulties in maintaining social functioning, and frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. (TR. 91).

*Daniel C. Beittel, M.D., (Medical Advisor, Social Security Administration), (3/24/94), (TR. 53–55)*

Dr. Beittel testified briefly at the ALJ hearing regarding plaintiff's condition. He found that the record indicated a personality disorder and substance abuse problem prior to December 31, 1987. Dr. Beittel did not comment further on the nature or severity of plaintiff's condition, as his testimony was cut short by a discussion of the reasons for the limited evidence in 1987. There is no evidence that Dr. Beittel's limited testimony was relied upon by the Appeals Council in its decision or by the plaintiff in her briefs. The Commissioner's statement that the Appeals Council relied on Dr. Beittel's assessment on the psychiatric review technique form is, therefore, not substantiated by the record.

*Richard Lundeen, Ph.D., (Clinical Psychologist), (11/1/94), (TR. 399–404)*

Dr. Lundeen was consulted by plaintiff's counsel to determine whether plaintiff's mental condition in 1987 could be currently diagnosed through an examination of the medical record. Based on the symptoms noted by Dr. Goldberg in his chart note summary of March 31, 1987, Dr. Lundeen concluded that the plaintiff suffered from dysthymia at that time. Moreover, he concluded that the condition had existed since at least 1985, two years prior to Goldberg's examination.

In evaluating plaintiff's functional limitations prior to December 31, 1987, Dr. Lundeen stressed Dr. Goldberg's notations that the patient was distressed, that she often cried and had symptoms of extreme tension. Dr. Lundeen relied on the testimony at the hearing regarding the plaintiff's inability to cook meals, clean her apartment or groom herself, to show that she was unable to perform normal daily activities. Dr. Lundeen also concluded that the plaintiff's social functioning was compromised by her mental health problem. This was evidenced by her difficulty interacting and communicating with customers and management when she confused food and drink orders while working as a waitress. Dr. Lundeen also noted that the plaintiff's inability to concentrate and focus her attention long enough to complete a specific task, such as cooking or forgetting to turn off a water faucet, indicated a continuing mental problem.

Dr. Lundeen pointed to the mental status examination performed by Solano County Mental Health on February 9, 1988, as further evidence of the plaintiff's social and functional impairment during the previous year. In that report, the Axis 4 identification of psychosocial stresses in the previous year was shown to be extreme and the GAF rating of 45 implied a greater than moderate disability. Dr. Lundeen concluded that these factors provided evidence of dysthymia prior to December 31, 1987.

*DISCUSSION*

A. *Plaintiff's substance abuse was a contributing factor material to a determination whether she had severe mental impairment during the period preceding her last date insured, that is, from February 11, 1987 through December 31, 1987.*

 While, as shown below, the court finds that plaintiff has easily met her burden of proving that her mental impairment was severe during the time period at issue,[10] and

---

**10.** The Commissioner has established a five-step

sequential evaluation process for determining

that the Appeals Council's conclusions to the contrary are not supported by substantial evidence,[11] this finding is based on the court's further finding that plaintiff's mental impair-ment and substance abuse were inextricably intertwined.

■ Regarding objective medical evidence, the Appeals Council held that while plaintiff's condition worsened after December 31, 1987, to the degree that by July 1992[12] she was

whether a person is disabled. *Bowen v. Yuckert,* 482 U.S. 137, 140–141, 107 S.Ct. 2287, 2290–2291, 96 L.Ed.2d 119 (1987); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Bowen v. Yuckert, supra,* 482 U.S. at 146, n. 5, 107 S.Ct. at 2294, n. 5. The Secretary bears this burden only if the sequential evaluation process proceeds to step five. *Ibid.*

The first step in the sequential evaluation analysis—whether plaintiff is currently engaged in substantial gainful employment—determined in the negative, leads to the second step. Step two of the sequential evaluation or the "severity regulation," 20 C.F.R. §§ 404.1520(c)—the step at issue in the present case—provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

The Supreme Court has upheld the validity of the "severity regulation," which allows the Commissioner to terminate the analysis if no severe impairment is found, based on medical factors alone. *Bowen v. Yuckert, supra,* 482 U.S. at 146–155, 107 S.Ct. at 2293–2298. In general, the regulation has been given a narrow interpretation, and "only those claimants with *slight abnormalities that do not significantly limit any basic work activity* can be denied benefits" at step two of the analysis without undertaking a vocational analysis. *Bowen v. Yuckert, supra,* 482 U.S. at 158, 107 S.Ct. at 2299 (emphasis added) (O'Connor, J., concurring); *see also Yuckert v. Bowen,* 841 F.2d 303 (9th Cir.1988); *Hudson v. Bowen,* 870 F.2d 1392, 1395–1396 (8th Cir.1989). As provided by Social Security Ruling (SSR) 85–28 (emphasis added):

> [At] the second step of sequential evaluation it must be determined whether medical evidence establishes an impairment or combination of impairments "of such severity" as to be the basis of a finding of inability to engage in any SGA [substantial gainful employment]. An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes *only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work* even if the individual's age, education, or work experience were specifically considered ... The severity requirement cannot be satisfied when medical evidence shows that the person has the ability to perform basic work activities, as required in

most jobs ... Although an impairment is not severe if it has no more than a minimal effect on an individual's physical or mental ability(ies) to do basic work activities, the possibility of several such impairments combining to produce a severe impairment must be considered.

Finally, the Commissioner must consider the combined impact of plaintiff's impairments, as underscored by 42 U.S.C. § 423(d)(2)(B), which provides in pertinent part:

> In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the [Commissioner] shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity.

See also *Gregory v. Bowen,* 844 F.2d 664, 666 (9th Cir.1988).

11. The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. *Copeland v. Bowen,* 861 F.2d 536, 538 (9th Cir.1988), citing *Desrosiers v. Secretary of Health and Human Services,* 846 F.2d 573, 575–76 (9th Cir.1988). Substantial evidence means more than a mere scintilla of evidence, but it is less than a preponderance, *Saelee v. Chater,* 83 F.3d 322, 323 (9th Cir.1996) citing *Sorenson v. Weinberger,* 514 F.2d 1112, 1119 (n. 10) (9th Cir.1975). "It means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 1428, 28 L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). The administrative law judge's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence. *Hammock v. Bowen,* 879 F.2d 498, 501 (9th Cir.1989), quoting *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir.1985). The record as a whole must be considered. *Howard v. Heckler,* 782 F.2d 1484, 1487 (9th Cir.1986). However, where proper legal standards have been applied, yet the evidence can be logically interpreted in more than one way, the Commissioner's interpretation must be upheld. *Sprague v. Bowen,* 812 F.2d 1226, 1230 (9th Cir.1987).

12. The Appeals Council references July 1992 as the date plaintiff was found disabled for purposes of SSI. More precisely, plaintiff applied for SSI

found disabled for SSI due to organic brain syndrome and substance abuse, the medical evidence for the period on or before December 31, 1987, did not establish the existence of a mental impairment that would have more than a minimal effect on plaintiff's ability to perform basic work activities. Substantial evidence does not support this conclusion.

The Appeals Council initially discounted plaintiff's March 1987 examination by Dr. Goldberg. While the Appeals Council agreed with Dr. Lundeen's subsequent characterization of Dr. Goldberg's report as a diagnosis of dysthymia, it concluded that Goldberg's summary did not support a finding of severe impairment, as it provided no clinical findings and was instead a cursory summary of symptoms reported by plaintiff. The exam also notes that plaintiff's anxiety and depression were caused in part by a difficult divorce, child custody battle and divorce attorneys who had "skipped town." The Appeals Council concluded that plaintiff's symptoms were typical for an individual dealing with such crisis and that there was no evidence of a continuing disorder.

By contrast, Dr. Lundeen, upon reviewing Dr. Goldberg's examination of March 1987, concluded that plaintiff suffered from dysthymia and limited functioning since at least 1985, two years prior to Goldberg's examination. Dr. Lundeen stressed Dr. Goldberg's notations that the patient was distressed, that she often cried and had symptoms of extreme tension, including pain in her head and neck, gritting of the teeth, clenching of fists, insomnia, appetite loss, decreased energy level and feelings of hopelessness. Relying on testimony from the ALJ hearing, Dr. Lundeen noted that plaintiff's inability to cook meals, clean her apartment or groom herself indicated that she was functionally restricted from performing normal daily activities. Also, plaintiff's limited social functioning was evidenced by her difficulty interacting and communicating with customers and management when she confused food and drink orders while working as a waitress. Dr. Lundeen finally noted that the plaintiff's inability to concentrate and focus her attention long enough to complete a spe-

cific task, such as cooking or forgetting to turn off a water faucet, indicated a continuing mental problem. (TR. 399–404).

Dr. Lundeen's conclusion that plaintiff was severely impaired prior to the expiration of her insured status on December 31, 1987 is entirely consistent with the record, particularly evidenced by her condition in February of 1988, which is probative of her condition less than two months before. In contrast, the Appeals Council's interpretation of the Goldberg exam appears reasonable only when viewed in isolation.

In February 1988, a mere six weeks after plaintiff's last date insured, plaintiff exhibited extremely irrational and destructive behavior. As earlier recounted, on February 3, 1988, plaintiff destroyed the interior of a hotel room for no apparent reason, as she reportedly had done several times before. She spoke with drug dealers she believed were behind mirrors, acted paranoid and was verbally abusive. Plaintiff had poor personal hygiene, was barefoot, had wet and uncombed hair, toothpaste smeared on her face, and a broken zipper on her jeans. (TR. 313). A police report of the incident noted plaintiff was likely on drugs, was yelling incoherently, and had appeared disoriented and confused. (TR. 186).

The mental status examination which followed on February 3, 1988, diagnosed plaintiff with an adjustment disorder with mixed emotional features, severe psychosocial stressors, and a GAF rating of 40. (TR. 312). Such a rating indicates major impairment in work and family relations and some impairment in reality testing and communication. The evaluator noted that plaintiff's mood was depressed and anxious and she expressed feelings of hopelessness, helplessness and low self-worth. (TR. 312).

■ Plaintiff's condition was so erratic that she was admitted to Napa State Hospital on a 5150 detention for 72-hours on February 9, 1988. At that time, plaintiff had trouble concentrating and making plans, had flight of ideas, pressured speech and loose associations. (TR. 199, 200). In addition, plaintiff was totally disorganized in terms of

and DIB in July 1992, and obtained such benefits

commencing February 1993. See n. 2, *supra*.

making reasonable living plans, slept excessively and would not eat. (TR. 200). Mental status examinations of February 9 and 11, 1988, provide even further evidence of severe impairment. Plaintiff was therein diagnosed with dysthymia, adjustment disorder, alcohol abuse and drug addiction. She was anxious and disoriented with impaired memory, moderate judgment, no insight and minimal concentration. She had moderate severity of psychosocial stressors and a GAF rating of 45, which indicates serious impairment in social or occupational functioning over at least the past year. (TR. 310, 195). Dr. Lundeen, in his November 1994 assessment, logically concluded that these examinations evidenced dysthymia manifesting in severe impairment for at least a short period prior to December 31, 1987. (TR. 399–404).[13]

In addition to the Goldberg exam and plaintiff's February 1988 Napa stay, the balance of the record supports the finding that plaintiff suffered from a severe impairment prior to December 31, 1987. Looking first to the evidence prior to 1987, the court notes that plaintiff's childhood, characterized by mental and physical abuse, set the stage for the development of a mental disorder. (TR. 361). Plaintiff's parents divorced after an abusive marriage. (TR. 363, 366). Her father was an alcoholic who would often beat plaintiff and her siblings (TR. 363), while plaintiff's mother reportedly mentally abused her. (TR. 246). Plaintiff herself married at age 19 to a drug addict whom she divorced six years later. (TR. 362, 366). While these factors do not necessarily lead to a mental disorder, they are certainly not inconsistent with one.

Starting in December of 1984, plaintiff entered group therapy at Solano County Mental Health seeking treatment for depression due to the impending divorce and child custody battle. (TR. 357, 360). A mental status

examination of January 1985 diagnosed plaintiff with an adjustment disorder with depression and continuous alcohol abuse, although there was not yet an observable mental disorder. (TR. 367). The evaluator assigned a GAF level of 50, noting plaintiff's dysphoric mood and blunted affect. Plaintiff also exhibited limited insight, pressured speech (TR. 367), and a general failure to take care of herself. (TR. 360).

While plaintiff was employed as a waitress during this period, from March 1985 to June 15, 1986, the GAF rating of 50 indicates that she was likely experiencing great difficulty functioning in the workplace. The Diagnostic and Statistical Manual of Mental Disorders (3rd edition) describes an individual with GAF rating of 50 as having serious impairment in social or occupational functioning. This rating is consistent with the testimony of plaintiff and her husband regarding the difficulty she had in performing her job duties, the likelihood of her dismissal, and her deteriorating condition in the months prior to the initial claimed onset date of June 15, 1986. (TR. 51).

Evidence of plaintiff's drug abuse problem further supports—moreover, significantly contributes to—proving the existence of a severe mental impairment prior to December 31, 1987. The Appeals Council held that while plaintiff had a history of substance and alcohol abuse, there was no evidence to show that she was unable to control the abuse during the period June 15, 1986 through December 31, 1987, or that it imposed more than a minimal restriction on her ability to work. The Appeals Council relied on the summary by Dr. Goldberg in March of 1987 which gave no indication of alcohol or substance abuse.

The Appeals Council's analysis, however, contradicts the record as a whole which indi-

---

**13.** In contrast, the Appeals Council found that records from plaintiff's hospitalization in Napa in February of 1988 did not evidence mental disability and instead showed only slight abnormalities in concentration and speech. It selectively cited records showing that plaintiff was calm and cooperative with no behavioral problems or psychotic thinking during her stay (TR. 202), that she ultimately felt better and socialized with her peers (TR. 205, 206), that her speech was clear (TR. 209), that she was generally oriented to time and place (TR. 202), and that the mental status examination of February 9, 1988 revealed only slight abnormalities. (TR. 9–10, 202, 203). The Commissioner's decision cannot, however, be affirmed simply by isolating a specific quantum of supporting evidence. *Hammock v. Bowen, supra,* 879 F.2d at 501. The record as a whole must be considered. *Howard v. Heckler, supra,* 782 F.2d at 1487.

cates that plaintiff's substance abuse contributed to a severe mental impairment prior to December 31, 1987. Plaintiff's history of substance abuse began at age 15. Just prior to the time period at issue, plaintiff reported regular use of alcohol, speed, Codeine, Motrin, Valium, Demerol and LSD. On occasion, she used Cocaine, hash, Librium, Tuinol, Seconol, percs, PCP, peyote and mescaline. (TR. 245, 287). While plaintiff did maintain employment during her drug use from March 1985 to June 15, 1986, testimony indicates she experienced increasing difficulty performing her job duties and was likely to be fired. (TR. 51). Moreover, after she was dismissed from her last job on June 15, 1986 for stealing, plaintiff testified that her drug use increased significantly. (TR. 42, 45–46).

The most convincing evidence that substance abuse contributed to a severe mental impairment prior to December 31, 1987, however, is plaintiff's irrational and destructive behavior in February 1988. As noted earlier, within six weeks of the expiration of her insured status, plaintiff destroyed the interior of a motel room. (TR. 313). Drug tests performed shortly thereafter, during her hospitalization at Napa, indicated amphetamine, opiate and benzodiazapine use. (TR. 214). The extent of plaintiff's drug abuse is further illustrated by documentation from the substance abuse rehabilitation program at Gateway beginning July 20, 1988. Upon admission, plaintiff was acutely toxic, having used Tylenol with Codeine, crystal methadrine, Xanax and alcohol earlier that day. Within previous weeks she had also used Valium, Cocaine, Triavil, Ativan, Motrin and Vasten. Upon examination, plaintiff was diagnosed with heroin, "speed", Codeine, Valium and alcohol dependence. (TR. 233). The sum of these records indicates a continuing substance abuse disorder starting in plaintiff's

teenage years, which deteriorated rapidly starting in June 1986 after plaintiff was fired from her job. Clearly, by 1988, plaintiff was taking drugs to the point of incapacitation. Considering both her history of drug abuse and her mental status in February 1988, it's not unreasonable to infer that plaintiff was severely impaired a mere six weeks earlier.

In summary, the record as a whole does not support the Appeals Council's finding that plaintiff did not suffer a severe mental impairment, of which substance abuse was an integral component, prior to December 31, 1987. While direct medical evidence within the critical time period of June 15, 1986 and December 31, 1987 is limited, the record contains extensive objective evidence prior to and subsequent to the period at issue. Such evidence, even without the benefit of supportive testimony,[14] demonstrates that plaintiff was afflicted with a continuing mental disorder and/or substance abuse problem as early as December 1984, when she first sought counseling. It also stands to reason that plaintiff's condition was a progressive one and that her state in February of 1988 was consistent with that on December 31, 1987.[15] The Appeals Council provided no legitimate basis for its conclusion that plaintiff's early 1988 severe exhibition of problems was simply an overnight phenomenon—rather, the objective evidence alone indicates that plaintiff's problems were significant prior to December 31, 1987.

Accordingly, this court finds that plaintiff met her burden of establishing the existence of a severe mental impairment within the insured status period. However, as the court's extensive analysis demonstrates, plaintiff's mental impairment and substance abuse were (and are) so intertwined that

---

14. Although the Appeals Council found that the testimony of plaintiff and her husband was not credible, the court finds that the objective medical evidence alone supports plaintiff's claim of severe impairment.

15. Social Security Ruling 83–20, allows for such informed inferences by providing:

With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling ... In such cases it will

be necessary to infer the onset date from the medical and other evidence that describe the history and symptomology of the disease process ... In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination.

See *Morgan v. Sullivan*, 945 F.2d 1079 (9th Cir. 1991); *Blankenship v. Bowen*, 874 F.2d 1116 (6th Cir.1989).

separate consideration of each is impossible, underscored by the diagnosis of organic mental disorder in 1993. Accordingly, the court concludes that plaintiff's substance abuse problem was "a contributing factor material to" this court's determination of disability. P.L. 104–121 §§ 105(a)(1), 105(b)(1).

B. *The Recent Amendments Are Properly Prospectively Applied To Cases Pending In the District Court After March 28, 1996* [16]

The effective date section for P.L. 104–121 (110 Stat. 847, 852) § 105(a) (para. 1) [the preclusion paragraph] is as follows (emphasis added):

(A) The amendments made by paragraphs (1) and (4) shall apply to any individual who applies for, *or whose claim is finally adjudicated by the Commissioner of Social Security with respect to, benefits under title II of the Social Security Act based on disability on or after the date of the enactment of this Act,* and, in the case of any individual who has applied for, and whose claim has been finally adjudicated by the Commissioner with respect to, such benefits before such date of enactment, such amendments shall apply only with respect to such benefits for months beginning on or after January 1, 1997.

P.L. 104–121 § 105(a)(5)(A). The substantively identical effective date was provided with respect to the preclusion of disability benefits based on substance abuse sought pursuant to Supplemental Security Income. P.L. 104–121 § 105(b)(5)(A).

The Supreme Court in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) had occasion to exhaustively discuss the "retroactive effect" or "retrospective application" of statutes. Al-

though at times difficult to apply to specific legislation, one clear principle stands out: If Congress has indicated that a statute is to have effect in cases pending at the time of the statute's enactment, the analysis ends, except in situations where retroactive effect of the statute would work unfairness of constitutional magnitude. *Landgraf,* 511 U.S. at ——, ——, 114 S.Ct. at 1498, 1499; *U.S. ex rel Lindenthal v. General Dynamics Corp.,* 61 F.3d 1402, 1407 (9th Cir.1995).

It is beyond doubt that Congress has expressly determined the effective date for the disability/substance abuse amendments. Therefore, all that remains of the analysis is to determine precisely what Congress intended with respect to application of the disability preclusion to the pending case for which an administrative "final decision" has been rendered (hence subjecting the administrative decision to judicial review), but for which, if this case were to be remanded for further workup as plaintiff requests, has not been "finally adjudicated by the Commissioner."

The highlighted effective date language quoted above is what applies to the present case, and dispositive to the present case is the meaning of "finally adjudicated before the Commissioner." The court thus employs the first, primary rule of statutory construction—what do the words of the statute plainly mean; if the meaning is plain, the analysis ends except in the most extraordinary of circumstances. *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 474, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992).

The court finds it instructive that Congress avoided using the well known Social Security term "final decision," but instead utilized the different term "finally adju-

---

**16.** The recent amendments have the effect of causing the parties to take the opposite position on the merits that they took prior to the passage of the substance abuse amendments. If the recent amendments are effective in plaintiff's case, and in order to avoid the strictures of the recent amendments, plaintiff, who asserted that she suffered from serious substance abuse both in and out of the pertinent period under review at the administrative level, *see,* e.g., TR 59, 62, must now argue that her substance abuse was immaterial. This would be difficult to do in that plain-

tiff's substance abuse problem was longstanding, and she was awarded a finding of disability in 1993 based, in part, on her longstanding substance abuse. And the Commissioner, who took the previous position that the substance abuse was immaterial during the pertinent period, must now argue that substance abuse significantly contributed to plaintiff's problems. Ignoring the necessary flip-flop in the parties' positions caused by the recent amendments, the court has simply made a fair assessment of the record in this respect, *supra.*

dicated." Therefore, the court may define "finally adjudicated" with its ordinary meaning, and is not compelled to read the phrase with a judicial gloss layered on the phrase over the course of decades. Obviously, in the case of a remand directing the Commissioner to re-decide a case, in whole or in part, the case has not been "finally adjudicated," i.e., there are decisions remaining to be made by the Commissioner. Employing the plain meaning of the words, the SSA/SSI amendments should be applied to this pending case—a case where the proper potential remedy is a remand to the Commissioner for further evaluation in the sequential analysis.

Even if resort needs to be made to legislative history, that history clearly supports the conclusion of this court:

Effective Date

Generally, changes apply to benefits for months beginning on or after the date of enactment. However, an individual *entitled to benefits before the month of enactment* would continue to be eligible for benefits until January 1, 1997.

P.L. 104–121, Contract With America Advancement Act of 1996, House Report 104–379, December 4, 1995 (emphasis added).

■ Thus, only those persons already *entitled to benefits* are shielded from the immediate effective date of the amendments. Plaintiff herein is not already entitled to benefits; thus, she may not qualify for benefits at all on account of her substance abuse being a material contributing factor to her disability regardless of the administrative or judicial procedural stage of this case.[17]

■ The Commissioner has forwarded to the court proposed clarifying amendments to the effective date of this legislation. This clarification was submitted because at least one court did not believe that the effective

date applied to judicial proceedings. If the clarification passed, it would expressly clarify that "final adjudication" refers to a case in any stage of processing, be it administrative or judicial, and the clarification would be effective back to the time of passage of the recent disability preclusion statute in question. Although this proposed clarification, should it become the law, would have binding effect on the court, at its present stage, the force of a proposed clarification by a legislator(s) to define the legislative intent of a previously enacted law is only very slightly probative.

■ Much more probative is the point made by the Commissioner that the agency's interpretation of an (ambiguous) statute within their cognizance is entitled to great deference. Assuming that the effective date section is ambiguous, a fact not apparent to this court in this case, "[t]he court need not conclude that the agency construction was the only one it could have permissibly adopted to uphold the [agency] construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (n. 11), 104 S.Ct. 2778, 2782 (n. 11), 81 L.Ed.2d 694 (1984). Here, in advocating the clarifying amendments discussed above in the Congressional arena, the agency has gone on record with its interpretation that the substance abuse amendments at issue were meant to apply whenever a final adjudication by the Commissioner has not been reached. And, such is the case here. The agency's position is entitled to deference.

Only two unpublished federal cases have been located that have interpreted the effective date of the SSA/SSI disability preclu-

---

**17.** As pointed out in *Estate of Cowart, supra,* a person's entitlement to benefits does not necessarily depend on the adjudicated fact of entitlement; however, in order to be entitled, the person must have obtained a status whereby the person has satisfied the prerequisites of entitlement. *Estate of Cowart*, 505 U.S. at 475, 112 S.Ct. at 2595. Unlike the worker in *Cowart*, who qualified automatically for benefits because of his work related injury, plaintiff does not qualify for disability benefits until she proves that she can-

not perform substantial gainful activity. Moreover, and further distinguishing *Cowart*, Congress chose to avoid in the SSA/SSI amendments the "entitlement" language expressly inserted in the workers compensation statute, and instead chose to make the *effective date dependent on* one's application or claim status. The result reached in this case is especially required where the main thrust of the Congressional enactment at issue is to *take away* an entitlement that previously existed.

**1330**

sion. In *Torres v. Chater,* 1996 WL 460054 (E.D.Pa.1996), the judge refused to find the substance abuse provisions' effective date applicable because plaintiff therein had "applied" for benefits prior to March 26, 1996. The case is not persuasive because the disjunctive phrase, "or whose claim is finally adjudicated by the Commissioner ... after the date of the enactment of this Act," was not analyzed at all. However, in *Armstrong v. Chater,* 1996 WL 467310 (W.D.Okla.1996), the court adopted the magistrate's findings and recommendations that, consistent with the Commissioner's proposed clarifying amendments, Congress intended that the new law apply "not only to those individuals with denied claims pending at the various administrative levels of review but also those ... with denied claims pending appeal in the Federal courts."

The court finds that the recent amendments are effective to preclude an award of benefits. As discussed above, any fair reading of the record demonstrates that plaintiff's mental problems during the pertinent period were intertwined and exacerbated by long-standing substance abuse.[18] Whether, absent the substance abuse amendments, the court were compelled to remand this case for further workup, the probable outcome, or whether this court could determine that plaintiff was disabled without further administrative input, plaintiff is not entitled to a present award of benefits (for a past period or otherwise) because her substance abuse disorder materially contributed to her claimed disability *during the pertinent period under review.*

*CONCLUSION*

This court therefore concludes that plaintiff is precluded from obtaining Disability Insurance Benefits based on her mental impairment (which this court finds to be severe, within the meaning of the Act, prior to plaintiff's date last insured), due to fact that plaintiff's substance abuse constituted a significant contributing factor material to the determination of mental impairment. Public

Law 104–121 §§ 105(a)(1), and 105(b)(1). Summary judgment is therefore entered in favor of defendant. Plaintiff's motion for summary judgment is denied.

IT IS SO ORDERED.

---

18. The court rejects plaintiff's position that it is logical to extrapolate plaintiff's mental problems exhibited after the pertinent period to demonstrate her mental problems during that period, but not her substance abuse problems. In any event, the record reflects continuous substance abuse problems before, during and after the pertinent period.